**PETTIS LAW FIRM LLP**
James C. Pettis, California Bar No. 223953
Christina I. Rodriguez, California Bar No. 310406
2447 Pacific Coast Hwy, Suite 100
Hermosa Beach, California 90254
Telephone:  (213) 545-6448
Facsimile:   (213) 816-1966
jimpettis@pettislawfirm.com
christina@pettislawfirm.com

Attorneys for Plaintiffs
JOHN NEVADO and ROBERT MEISSNER

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN NEVADO, an individual; and ROBERT MEISSNER, an individual;<br><br>Plaintiffs,<br><br>v.<br><br>OFFICE DEPOT, LLC, a Florida corporation<br><br>Defendant. | Case No.<br><br>**PLAINTIFFS JOHN NEVADO AND ROBERT MEISSNER COMPLAINT FOR:**<br><br>**1. BREACH OF CONTRACT**<br>**2. SERVICES RENDERED**<br>**3. INTENTIONAL MISREPRESENTATION**<br>**4. UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>28 USC § 1332(a) |

Plaintiffs John Nevado and Robert Meissner (collectively, "Plaintiffs") bring this Complaint against Defendant Office Depot, Inc. ("Office Depot" or "Defendant"), and DOES 1 through 50, in support, on information and belief, allege as follows:

## THE PARTIES

1. At all relevant times, John Nevado resided in the state of New York.

2. At all relevant times, Robert Meissner resided in the state of California.

3. Upon information and belief, at all relevant times, Office Depot was a company duly organized and existing under and by virtue of the laws of the state of Delaware, with its principal place of business in Boca Raton, Florida, and maintains over seventy retail stores across the state of California.

4. Plaintiffs are unaware of the true names and capacities, whether individual, corporate, agent, representative, or otherwise, of Defendants named as DOES 1-50 and therefore sues those defendants by such fictitious names. Plaintiffs are informed and believes, and thereon alleges, that each of the Defendant DOES is in some manner responsible for the acts and occurrences alleged herein; and that each DOE Defendant is therefore liable to Plaintiffs as alleged herein. Plaintiffs will seek leave of Court to amend this Complaint to set forth the true names and capacities of these fictitiously named Defendants when they are ascertained.

## JURISDICTION

5. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiffs are citizens of New York and California, and Defendant is a citizen of Florida where it has its principal place of business; and the aggregate amount in controversy is believed to exceed $75,000.

6. This Court has personal jurisdiction over Defendant because of Defendant's purposeful conduct within the District. As alleged below, a large part of the contract that Defendant entered and breached was to be performed in Los

Angeles. As is alleged below, the relationship that Plaintiffs facilitated was between Office Depot and BYD Co Ltd. ("BYD") which distributed the supplies Plaintiffs sourced through its wholly owned subsidiary located in Los Angeles, California. On information and belief, Office Depot received the supplies sourced by Plaintiffs through the shipping port also located in Los Angeles County, California. Plaintiff Meissner entered the subject contract from within the District. These facts combined with Defendant's substantial retail presence within the District constitute purposeful contacts such that the exercise of personal jurisdiction is fair and reasonable.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, a substantial part of the events giving rise to the claims asserted herein occurred or were to occur in this District.

## FACTUAL ALLEGATIONS

8. Plaintiffs and Defendant entered an agreement wherein Plaintiffs would facilitate and consult regarding the supply of Personal Protective Equipment ("PPE") during the height of the COVID-19 pandemic.

9. Defendant breached this agreement with Plaintiffs by failing to compensate Plaintiffs their agreed upon consultancy fees for sourcing and facilitating the delivery of PPE, after Plaintiffs had already significantly performed at the request and to the benefit of Defendant.

10. In or around March 2020, when the World Health Organization (WHO) declared COVID-19 a global emergency due to the coronavirus outbreak, the United States was experiencing a significant shortage in PPE.

11. In April 2020, Plaintiffs and Office Depot had numerous discussions related to Plaintiffs' facilitation and consultation for the supply of PPE to Office Depot based on Plaintiffs particular experience and connections. These discussions included many discussions directly with Defendant CEO Gerry Smith.

12. At the request of Defendant and on reliance that the parties were operating in good faith to come to terms of an agreement, Plaintiffs sent to Office Depot extensive information regarding the types of PPE required, pricing, preferred methods of shipment, quantities required by Defendant, and photos and registration information of the masks. Additionally, Plaintiffs made it clear repeatedly that there would be a fee for the services that Plaintiffs were providing that was separate from the pricing of the masks.

13. Office Depot's initial request was that Plaintiffs help it source approximately 200 million 3 ply face masks and 15 million N95 respirators to be delivered in May 2020. Followed by 500 million 3 ply face masks and 100 million N95 respirators in June 2020, with additional orders to follow.

14. On or about April 10, 2020, Plaintiffs returned several documents requested by Office Depot, including a Trade Vendor Purchasing Agreement ("TVA"), EDI Form, and W-9 form.

15. On April 11, 2020, Office Depot informed Plaintiffs that it had "small changes" to the forms Plaintiffs have submitted. In addition to the non-material changes, Office Depot requested more information from Plaintiffs in a separate document. However, Office Depot, including through its CEO Gerry Smith and other top executives, insisted that because of the importance of securing PPE as soon as possible, Plaintiffs would need to work on Office Depot's behalf based on the parties' verbal agreements and, at the same time, Office Depot would reduce the agreements to writing.

16. On or about April 11, 2020, Office Depot requested that Plaintiffs provide a legal entity that could sign on as a "trade vendor" with Office Depot through the TVA instead of an individual so that it could avoid importing and customs complications and could deal with a US based company. Plaintiffs did so.

17. Plaintiffs and Office Depot agreed and began to operate with the legal entity registered with Office Depot by Plaintiffs serving as the vendor that Office Depot would source and import PPE through. Plaintiffs facilitated this transaction for an agreed upon fee. Plaintiffs continued to source and provide logistics for Office Depot's sourcing and importing of PPE.

18. On April 23, 2020, Office Depot requested that Plaintiffs present it with a vendor/solution for PPE with financing options to pay a U.S. based company, shipping solutions, payments terms, and a large supply for N95s and 3 ply masks.

19. As instructed, Plaintiffs delivered on Office Depot's mandate by finding a solution in BYD Co Ltd. ("BYD"), one of the largest companies in China, that could perform to the specifications Office Depot had expressed on the call.

20. BYD distributed its PPE products in the US through its wholly owned subsidiary, Global Healthcare Product Solutions LLC, located at 1800 S Figueroa Street, Los Angeles, California 90015.

21. On or about April 24, 2020, Nevado returned Office Depot's administrative agreements (TVA and Vendor EDI Request Form) to Office Depot that were executed by the trade vendor registered by Plaintiffs.

22. Throughout the morning of April 26, 2020, Office Depot, including through its CEO Gerry Smith and other top executives, continued to pepper Plaintiffs with requests to facilitate the supply of PPE from BYD with constant reassurance that legal agreements memorializing the agreed-upon material terms were in the works and would be sent over shortly. Defendant top executive Meehan advised the Plaintiffs, "[o]n legal agreements, we are drafting and will be sending over a consulting agreement that should meet ur [sic] needs with language around engagement with BYD etc."

23. Meehan sent Plaintiffs a commission schedule that Office Depot drafted with an 8% commission rate for the delivered units of PPE, based on the cost

of each product. (*See* Ex. A, compensation.) This was the commission rate that the parties had always discussed throughout their talks.

24. The parties agreed to the commission schedule and non-circumvent language, which they agreed to reiterate in a Consultant Services Agreement.

25. Facing an April 28, 2020, deadline to place a supply order, Office Depot continued to request information from Plaintiffs regarding BYD products based on their agreements.

26. On or about April 27, 2020, Plaintiffs and Office Depot confirmed and agreed upon the terms to include in the Consultant Services Agreement, which was then memorialized in the agreement provided to Plaintiffs later that day.

27. On April 28, 2020, John Tinsman (in-house counsel at Office Depot) sent to Plaintiffs a revised draft of the Consultant Services Agreement, which did not modify the parties' agreed upon material terms, including the compensation schedule, and only had non-material changes.

28. Office Depot repeatedly requested that Plaintiffs immediately work to source PPE. Plaintiffs kept CEO Gerry Smith apprised of the work they were conducting on Office Depot's behalf and the opportunities that they were facilitating for it. CEO Smith had extensive communications with Plaintiffs' team and was intimately involved in the contract inducement and formation.

29. In hindsight, although the parties had agreed to all the materials terms governing Plaintiffs' work for Office Depot, it appears that Office Depot was downplaying the actual execution of a written consulting agreement with Plaintiffs in an effort to get the benefit of Plaintiffs' performance – the introduction and coordination with a supplier of critically important PPE, along with the facilitation of the supply of that PPE – while simultaneously attempting to cut Plaintiffs out once Office Depot had reaped that benefit.

30.     On April 29, 2020, understanding Plaintiffs had already verbally agreed with Office Depot on all material terms of the Consultant Services Agreement, and in an attempt to start placing orders before a Chinese Labour Day holiday that would shut down factories in China from May 1 to May 5, 2020, Nevado introduced Office Depot CEO Gerry Smith to Oscar Su ("Su"), Head of Global HealthCare Solutions at BYD.

31.     After connecting BYD to Office Depot, Office Depot and Plaintiffs again agreed that Plaintiff would continue to serve as consultants to Office Depot to provide facilitation, logistical support, and in sourcing the PPE from BYD.

32.     That same day, Office Depot sent BYD a Letter of Intent that confirmed Office Depot's intent to buy 200 million 3 ply face masks and 15 million N95 respirators to be delivered in May 2020 from BYD, and to buy 500 million 3 ply face masks and 100 million N95 respirators to be delivered in June.

33.     Following Plaintiffs' April 29, 2020 introduction and on the same day Office Depot signed the Letter of Intent, John Gannfors of Office Depot communicated directly to Su, Head of BYD America, via WeChat to try to circumvent Plaintiffs and establish a direct link between BYD and Office Depot to source the PPE.

34.     Office Depot realized that they had already received significant benefits of performance from Plaintiffs by virtue of the introduction to Su and BYD, and Plaintiffs' weeks of tireless work in sourcing and facilitating the delivery of the PPE. Seeking to avoid compensating Plaintiffs, Office Depot reached out to Su in an attempt to circumvent the parties' agreement. Office Depot's direct contact with BYD violated the parties' agreement and was an improper and clumsy attempt to cut Plaintiffs out of their duly negotiated deal.

35. To make matters worse, Office Depot did so with full knowledge that Plaintiffs had already spent significant time and energy in sourcing, securing, and facilitating the PPE, including having made the introduction to BYD. Throughout, Plaintiffs continued to act as liaison and facilitator between Office Depot and BYD throughout their negotiations as had been agreed upon and at the behest of Office Depot.

36. Therefore, on information and belief, every communication from Office Depot to Plaintiffs once Office Depot began their "circumvention campaign" was an intentional misrepresentation of their plans and intentions to deal with Plaintiffs in good faith and compensate them for their performance.

37. In a ruse to further exclude Plaintiffs from the deal, and despite that the parties had already agreed to all the material terms of their agreement, Office Depot began insisting on irrelevant and non-material contractual language in the TVA and Consultant Services Agreement that it had not previously mentioned during its numerous discussions with Plaintiffs.

38. From the April 23, 2020 telephone call with Office Depot until June 2020, Plaintiffs worked tirelessly and incessantly with BYD's representatives in China and the United States to introduce and interface the purchasing department of Office Depot with BYD and their logistics provider.

39. At the same time, Plaintiffs worked simultaneously with multiple teams from both Office Depot and BYD to make sure the PPE met US standards, which included complicated negotiations with the third-party certification and testing company, SGS.

40. Plaintiffs worked to ensure that the PPE products at SGS's testing facilities in China and the USA were labeled and tested correctly and under the right standards.

41. Plaintiffs' work to source and deliver the massive quantities of products that Office Depot desired to purchase from BYD were made pursuant to the parties' agreement that Plaintiffs would be compensated based on the agreed-upon commissions schedule, which is contained in the Consultant Services Agreement. As made clear by its actions as well as written and verbal communications, Office Depot had agreed to the material terms of the parties' agreement.

42. Based on the units of PPE that BYD has supplied to Office Depot starting in May 2020 and to the present, including millions of face masks, respirators, test kits, gloves, and sanitizer, Plaintiffs are entitled to compensation for their services of more than $15,000,000 based on the delivered cost of PPE.

## OFFICE DEPOT'S BREACH AND FAILURE TO PAY THE COMPENSATION OWED TO PLAINTIFFS

43. On or about May 9, 2020, after Plaintiffs questioned Office Depot regarding its failure to compensate Plaintiffs for their services in sourcing and facilitating the delivery and sale of PPE based on the terms of their agreement, Meehan responded: "We are working on a solution." However, it started to become clear that Office Depot had no intention of honoring their agreement with Plaintiffs.

44. On May 11, 2020, Meehan responded that Office Depot was not looking "for further assistance" from Plaintiffs because Office Depot was now in communication with BYD to purchase PPE.

45. To be clear, Office Depot would never have had an introduction to BYD, nor would they have been even close to being in a position to purchase PPE, if not for the direct efforts of Plaintiffs.

46. Due to Plaintiffs' efforts, upon information and belief, Office Depot ordered in May 2020 (200 million 3 ply face masks and 15 million N95 respirators) and in June 2020 (500 million 3 ply face masks and 100 million N95 respirators), and importantly BYD continues to supply Office Depot with PPE today as a result

of Plaintiffs' extensive efforts.

47. In or around late May 2020 and June 2020, Plaintiffs again requested that Office Depot honor their agreement to compensate Plaintiffs for their work and services in sourcing and facilitating the sale of PPE pursuant to the parties' agreements; specifically, the compensation schedule contained in the Consultant Services Agreement that was negotiated and agreed upon with Office Depot.

48. On June 15, 2020, Office Depot sent Plaintiffs a proposal to pay them approximately $147,000 (total) for their efforts in direct violation of the terms of the agreement between Plaintiffs and Office Depot.

49. This was a far cry from Office Depot's agreement to compensate Plaintiffs between 6-10% of the Delivered Cost of each unit of PPE, which Plaintiffs estimate could reach (or exceed) $15,000,000, which was expressly acknowledged and agreed to by Office Depot.

50. As a result of Office Depot's breach of contract, Plaintiffs are owed approximately $15,000,000, which represents the fees Plaintiffs are entitled to for facilitating, logistical support, and sourcing PPE for Office Depot to protect against the spread of COVID-19. In addition, Plaintiffs seek other damages caused by Defendant's fraudulent and tortious actions and detailed below, along with their reasonable attorneys' fees, costs, and interest.

## FIRST CLAIM: BREACH OF CONTRACT

51. Plaintiffs hereby incorporate by reference all the preceding paragraphs as if fully set forth herein.

52. As alleged above, Plaintiffs and Defendant entered a binding contract wherein Plaintiffs were to perform sourcing or consulting services to Office Depot for PPE.

53. Plaintiffs did all, or substantially all, of the significant things that the contract required them to do. Specifically, as stated in the paragraphs above,

1 Plaintiffs located the product supplier (BYD/Global Healthcare Product Solutions, LLC), negotiated the product pricing, quantities available, shipping methods, delivery dates and locations, and product inspection and testing.

54. Indeed, as Plaintiffs had promised Office Depot in an initial email communication, Plaintiffs remained in the process and helped guide Office Depot throughout.

55. Office Depot accepted Plaintiffs' performance but have failed to pay Plaintiffs for that performance as the contract required it to do.

56. To the extent Plaintiff has not substantially complied with the terms, provisions, and conditions precedent of the contract, Defendants waived and/or is estopped from asserting such a defense because its actions and course of conduct have been inconsistent with an intention to enforce requirements under the contract.

57. By virtue of Defendant's failure to compensate Plaintiffs for their performance, Plaintiffs have been damaged by an amount to be proved at trial.

## SECOND CLAIM: SERVICES RENDERED

58. As described in the paragraphs above, Defendant Office Depot, by words and conduct, requested that Plaintiffs perform services for its benefit.

59. As described in the paragraphs above, Plaintiffs performed the services as requested.

60. Office Depot has not paid Plaintiffs for the services, which were provided.

61. Plaintiffs will prove the reasonable value of these services, which are well above the jurisdictional minimum of this court, at trial.

## THIRD CLAIM: INTENTIONAL MISREPRESENTATION

62. Plaintiffs hereby incorporate by reference all the preceding paragraphs as if fully set forth herein.

63. Defendant made numerous representations to Plaintiffs to induce Plaintiffs to enter the contract with Defendant, particularly regarding their intent to compensate Plaintiffs for the services they were providing, as alleged in paragraphs 1-16, 8-19, 22-33.

64. These representations were material facts, meant to keep Plaintiffs performing for Defendant's benefit and they were demonstrably false. Plaintiffs are informed and believe that Defendant concealed the facts that it was intending to cut Plaintiffs out of its deal with BYD, surreptitiously contacting BYD in attempts to circumvent the agreement it had with Plaintiffs and would not pay Plaintiffs for the services performed at Defendant's behest.

65. Defendant knew that its representations were false when made or were made recklessly and without regard for their truth.

66. Defendant intended for Plaintiffs to rely on the representations. Indeed, they were intended to persuade Plaintiffs to continue performing pursuant to the parties' agreement.

67. Plaintiffs reasonably relied on Defendant's misrepresentations. Plaintiffs reasonably believed Defendant's statements and conduct at the time to be truthful, and such reliance was a substantial factor in causing Plaintiffs' harm.

68. As a result of Defendant's fraudulent conduct and statements as alleged, Plaintiff was harmed and suffered, separate and distinct economic losses to be proved at trial.

69. Plaintiffs, on information and belief, and on that basis alleges, that in taking such actions, Defendant was guilty of oppression, fraud and/or malice, as defined in California Civil Code section 3294. Defendant's conduct was despicable and intended to cause injury to Plaintiffs and deprive Plaintiffs of its rights and was carried on by Defendant with a willful and conscious disregard of Plaintiffs' rights and the consequences of its actions on Plaintiffs.

## FOURTH CLAIM:  UNJUST ENRICHMENT

70. Plaintiffs hereby incorporate by reference all the preceding paragraphs as if fully set forth herein.

71. By engaging in the conduct alleged above, Office Depot received unjust benefits, namely the benefit of the value of Plaintiffs' sourcing of PPE.  Office Depot has unjustly retained this value at Plaintiffs' expense and has provided no compensation to Plaintiffs.

72. Office Depot's unjust retention of benefits at Plaintiffs' expense caused Plaintiff's harm, for which Defendants must provide restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demands judgment in its favor and against Defendant as follows:

1. For general damages in a sum in excess of the minimum jurisdictional amount according to proof;
2. For punitive damages;
3. For prejudgment interest;
4. For costs of suit incurred and attorneys' fees, as applicable;
5. For appropriate injunctive relief;
6. For restitution; and
7. For such other and further relief deemed just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests that this action be tried before a jury.

Dated: April 4, 2022

**PETTIS LAW FIRM LLP**

By: */s/ J. Pettis*

James C. Pettis
Christina I. Rodriguez
Attorneys for Plaintiffs
John Nevado and Robert Meissner